J-A12031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: T.L.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.L.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1575 MDA 2020 |

Appeal from the Decree Entered December 1, 2020
In the Court of Common Pleas of York County Orphans' Court at No(s):
2019-0097A

BEFORE: LAZARUS, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED AUGUST 02, 2021**

D.L.W. ("Mother" or "Natural Mother") appeals from the Decree granting the Petition, filed by F.A.L. ("Father") and his wife, A.J.L. ("Stepmother") (collectively, "Petitioners"), and involuntarily terminating Mother's parental rights with respect to her child, T.L.H. ("Child") (a female born in October 2013), pursuant to 23 Pa.C.S.A § 2511(a)(1) and (b), so that Stepmother may adopt Child. We affirm.

This case has a protracted procedural and factual history. Child was born in October 2013 to Mother, while Mother was incarcerated. Trial Court Opinion, 12/1/20, at 2. Mother's mother, D.M. ("Maternal Grandmother"), assumed custody of Child until Mother was released from prison. *Id.* at 2-3. Mother had originally named another man as Child's father. However, upon her release from prison, she contacted Father and informed him that he was Child's father, and genetic testing confirmed the same. *Id.* at 3. Mother and

Father were able to co-parent Child amicably until 2017, when Father became concerned about Mother's stability. *Id.* In June 2017, Father commenced a custody action regarding Child and initially, the trial court awarded Mother primary physical custody. *Id.* at 2. In December 2017, following a custody trial, primary physical custody was awarded to Father. *Id.* Father subsequently filed an Emergency Petition for Special Relief in Custody, which the trial court granted on December 21, 2017. *Id.* at 4. At that time, the trial court ordered that Mother's physical custodial periods be supervised at the YWCA or other credible facility. *Id.* Issues arose regarding Mother's supervised custody, and the court entered another Order, dated February 9, 2018, directing that Mother's weekly visits be supervised by Child First in Harrisburg, and limited to one to two hours. *Id.* at 4-5.

On June 6, 2019, Petitioners filed a Petition seeking the involuntary termination of Mother's parental rights to Child, along with a Petition for adoption, so that Stepmother may adopt Child. Petition for Adoption under 23 Pa.C.S.[A.] § 2701, 6/6/19; Petition for Involuntary Termination of Parental Rights, 6/6/19. The custody action was stayed by Order dated September 27, 2019, pending determination of the adoption proceedings.[1] Trial Court Opinion, 12/1/20, at 5.

_____

[1] Notably, Father filed a Notice of Relocation on June 12, 2020, stating his intent to move to Plymouth, New Hampshire. Trial Court Opinion, 12/1/20, at 5. Mother timely responded with a Counter-Affidavit that she did not object to the relocation. *Id.*

On September 12, 2019, the trial court appointed Leanne M. Miller, Esquire ("Attorney Miller"), as counsel for Mother, and Laura Smith, Esquire ("Attorney Smith") as legal interest counsel for Child. Order Scheduling Hearing and Appointing Counsel, 9/12/19. On December 30, 2019, the trial court appointed Katherine Doucette, Esquire, to serve as the guardian *ad litem* ("GAL") for Child. Order Appointing Guardian for Minor, 12/30/19.

By way of further background, Father and Stepmother married in June 2017. N.T., 8/20/20, at 7. Mother married F.W. ("Stepfather") in November 2017. *Id.* at 70. Mother and Stepfather's relationship has had incidents of physical abuse and violence. N.T., 1/16/20, at 40. Both Mother and Stepfather have criminal records.[2] Mother has five children in addition to Child. N.T., 8/20/20, at 70.

The trial court held evidentiary hearings on the termination and adoption Petitions on January 16, 2020, June 12, 2020, and August 20, 2020. At the January 16, 2020, hearing, Petitioners were present, along with their counsel, Kathryn Nonas-Hunter, Esquire. Mother was present with Attorney Miller. Attorney Smith and Child's GAL were also present, but the trial court excused Child from the hearing. N.T., 1/16/20, at 7. At the commencement of the proceeding, the trial court took judicial notice of the three pending York

---

[2] Mother has criminal convictions relating to drug possession and delivery, robbery, and conspiracy. Stepfather has criminal convictions relating to terroristic threats, simple assault, and possession of drug paraphernalia. Trial Court Opinion, 12/1/20, at 5-6.

County actions involving the parents: the termination/adoption matter; a custody action, which was stayed; and a child support action. *Id.* Petitioners first presented the testimony of Todd Ross ("Ross"), a licensed private investigator with York County. *Id.* at 8. Father then testified on behalf of himself and Stepmother. *Id.* at 24.

At the hearing on June 12, 2020, the parties were again present with their respective counsel. Mother testified that she had knowingly, intelligently, and voluntarily signed a consent to the termination of her parental rights, and she acknowledged that she had a thirty-day period in which to revoke her consent. N.T., 6/12/20, at 11-17; Consent to Termination of Parental Rights, 6/12/20. Subsequently, on June 25, 2020, Mother filed a revocation of her consent. Revocation of Consent, 6/25/20. Thus, the trial court scheduled another day of hearing on the Petitions.

At the hearing on August 20, 2020, the Petitioners presented the testimony of Stepmother. N.T., 8/20/20, at 6. Mother presented the testimony of Father's former landlord, D.S. N.T., 8/20/20, at 55-57. D.S. owned the property previously leased by Father's father ("Paternal Grandfather"), where Paternal Grandfather, Paternal Grandmother, Father, Stepmother and Child had resided. *Id.* at 15, 56-57. Mother then testified on her own behalf. *Id.* at 69.

In its Opinion, the trial court made the following findings of fact from the testimonial and documentary evidence at the hearings:

1. The [] Parents never married. [] Child was born out of wedlock with the Father neither knowing nor being informed about [] Child's birth.

2. The Petitioners married in June [] 2017.

3. The Petitioners and [] Child have lived together full[ ]time as an intact family since December 2017[,] when custody was transferred by custody [O]rder dated December 8, 2017.

4. The six[-]month timeframe immediately preceding the filing of the [P]etition [was] from December 6, 2018, to June 6, 2019, the later date being when the [P]etition to terminate parental rights was filed.

5. During the operative six[-]month timeframe, Natural Mother had no contact whatsoever with Father or [] Child other than a few phone calls. To the contrary, Natural Mother never provided Father with her current residence address or a phone number where she could be reached to discuss their legal custody rights or in the event of an emergency[,] as the custody [O]rders required. She did not even text Father to ask about [] Child's welfare.

6. There is no evidence that Natural Mother communicated with [] Child either directly via telephone, mail, or any other means since at least May 2018. Similarly, there is no evidence that Natural Mother sent [] Child any letters generally during the operative timeframe, or presents or cards for Christmas 2017 or [] Child's fifth birthday in October 2018.

7. Likewise, there is no evidence Natural Mother performed any parental duties during those six months. Rather, the Petitioners performed all parental duties during that timeframe in the vacuum left by Natural Mother's absence, making all major decisions concerning [] Child's health, medical, dental and orthodontic treatment, mental and emotional health treatment and needs, education and religious training. The Petitioners['] performance of such parental duties included: a) engaging a pediatrician to examine [] Child and update her lack of needed immunizations; b) purchasing private health care insurance for [] Child upon learning that Natural Mother allowed [] Child's previous insurance to lapse and had not obtained alternative coverage nor could Father obtain such coverage without Natural Mother's approval,

which was not forthcoming; c) engaging a dentist to examine [] Child for the first time[,] who reported that [] Child has good dental health; and d) undertaking all of the daily tasks of childrearing, including wakeup and bedtime routines, cooking breakfast, helping [] Child dress and get ready for school (kindergarten), taking her to the bus stop and putting her on the school bus, preparing and sharing family meals, attending all medical and dental appointments, and making all decisions concerning [] Child jointly.

8. The lack of communication and contact is confirmed by the testimony of [] Ross, a licensed private investigator. Father was constrained to hire [] Ross to locate Natural Mother, not knowing her whereabouts or how to contact her. [] Ross performed an exhaustive search after initial efforts to locate Natural Mother proved fruitless[,] with current occupants of her last known address in Williamstown, Pennsylvania[,] advising that she had moved. [] Ross'[s] search efforts began on June 12, 2019 and included using the TLO investigative research database (similar to Accurint), social media and old fashioned in-person sleuthing. He was ultimately able to locate and serve Natural Mother in Wiconisco, Pennsylvania[,] on August 22, 2019, two months later. Such lack of contact persisted until after Natural Mother was served.

9. Other than failing to return phone calls from unknown phone numbers and insisting that Natural Mother comply with the custody [O]rders, the Petitioners never did anything to discourage Natural Mother from being involved in [] Child's life.

10. Natural Mother never provided any financial support for [] Child after primary physical custody was transferred to Father.

11. By way of explanation for her failure to perform parental duties, Natural Mother contends she believed she had completed all eight of the supervised visits by May 2018[,] and expected to go back to custody conciliation in June[,] only to have the custody action transferred to York County. She also expected to receive notice of rescheduling upon transfer, but never did. She claims she contacted Mid-Penn Legal Services[("Mid-Penn")] requesting legal representation, but acknowledges Mid-Penn declined to represent her since it was a custody action.

12. The [c]ourt finds that [*sic*] such explanation and inaction to be inconsistent with Natural Mother's duty to remain actively engaged in [] Child's life. Natural Mother knew that Father was not counting the YWCA visit toward completion of the eight supervised visits requirement[,] as it was terminated due to Natural Mother's behavior. She was also well aware of the Custody Conference Officer's observations of the case set forth in her Custody Conference Summary Report of May 7, 2018, which were:

> Mother refused to follow the December 8, 2017 [O]rder and then failed to cooperate with the supervised visits. She eventually liked the visits and found them beneficial. Mother says she will now follow the [O]rder. Father doubts this and reports that Mother has behavioral fluctuations. He wants to keep supervised visits. Mother refused supervised visits pending trial[,] even though Father offered to pay.

It was, therefore, incumbent upon Mother to continue the supervised visits until that condition was modified, which she failed to do. It was also incumbent upon her to take active steps to modify the custody [O]rder, which she did not initiate until after being served with the pending [P]etition. Instead of pursuing a course to maximize her active engagement with [] Child, Natural Mother choose [*sic*] stasis instead [*sic*]. It is also notable that there is another entry on the custody docket after entry of the transfer [O]rder, that being an Order of July 31, 2018, advising the parties that a pending Emergency Petition for Special Relief was denied.[FN6] Certainly, Natural Mother's receipt of the July 31, 2018 [O]rder put her on notice that nothing further was going to transpire in the custody action without her taking definitive action, which she failed to do. Critically, there is no further docket activity in the custody action until August 6, 2019, over a year later.

13. Mother called [D.S.] as a witness to testify on her behalf. [D.S.] and her husband were the plaintiffs/landlords in an action in ejectment they filed against Father, as tenant, in August 2019. [D.S.] developed a personal friendship with Natural Mother, primarily through phone conversations, which primarily focused upon Natural Mother making inquiry about whether [D.S.] could provide information about [] Child. [D.S.] eventually met Natural Mother and observed her interacting favorably with her other children. She admits she never observed either party interacting

- 7 -

with [] Child. She admits Natural Mother changes her phones and phone numbers frequently. Most critically, she never informed Father of Natural Mother's inquiries nor did Natural Mother ever enlist her as a conduit to facilitate opportunity for Natural Mother to have increased contact with [] Child.

14. Natural Mother testified she follows [] Child's progress in school by interacting on her own with school authorities, but there is no evidence she ever did so in an interactive way involving [] Child[,] such as attending school events, parent/teacher conferences or otherwise. Natural Mother also testified the "girls," [] Child and her two older female siblings, play well together. She admitted that [] Child has never met her two younger siblings[,] nor has she spoken with any of them by phone. [Stepmother] reports [] Child never asks about or mentions her siblings.

15. While [] Child knows her Natural Mother and expressed a preference to continue having telephone contact with her, she does not consider her to be a source of comfort and security. The [c]ourt finds that no meaningful bond currently exists between Natural Mother and Child. Such bond may have begun formulating after Natural Mother was paroled in July 2014, but it never coalesced in a meaningful way. [] Child was raised from birth and during infancy by her [Maternal Grandmother]. Upon Natural Mother regaining custody of [] Child, she exposed [] Child to her abusive relationship with [Stepfather]. [Stepmother] reports Natural Mother's behavior at custodial exchanges was inappropriate.

Natural Mother made verbal threats to Father to have him arrested and deported. [Stepmother] also observed seeing [] Child in fear of Natural Mother. Upon placement of primary custody with Petitioners, [] Child presented as very reserved, nervous, and lacking a significant attachment with Natural Mother. [] Child would experience separation anxiety when Father left her company. She was timid and reluctant to talk about Natural Mother, just calling her "[by name]," not mom, mommy, or any other expression singling her out as being her mother. Additionally, at a court ordered post-petition contact with Natural Mother, [] Child became anxious and cautious, backed away from close interaction and positioned herself within [Stepmother's] personal space as a protective umbrella.

16. There has been minimal post-[P]etition contact. As noted herein, Natural Mother's efforts to process a petition to modify in the custody action have been stayed pending the outcome of this proceeding.

17. The Petitioners have provided [] Child with a safe and stable environment that attends to her financial, emotional, educational and physical needs.[FN7] They have provided stability, safety, and security, regularly and consistently, for [] Child over an extended period of time; that is, since late December 2018.

18. [] Child has established a significant and meaningful emotional parent[-]child bond with the Petitioners. She calls [Stepmother] "mom" or "mommy." [] Child is now capable of expressing her feelings, thriving in her educational process and blossoming generally.

_____

[6] The Emergency Petition for Special Relief, which appears to have been considered, is Natural Mother's [P]etition dated January 12, 2018, in which she complains regarding lack of contact with [] Child.

[7] Natural Mother introduced evidence to dispel this finding by way of the aforementioned ejectment action seeking to evict Petitioners from their home and disruption of utility service. The [c]ourt accepts Petitioners' explanation that these were short-term inconveniences that were promptly remedied.

Trial Court Opinion, 12/1/20, at 7-13 (footnotes in original).

In the Decree entered on December 1, 2020, the trial court involuntarily terminated Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). Mother timely filed a Notice of Appeal, along with a Pa.R.A.P. 1925(a)(2)(i) and (b) Concise Statement of errors complained of on appeal.

In her brief on appeal, Mother raises two issues:

I. Did the orphans['] court abuse its discretion because the facts are insufficient to establish grounds for the involuntary termination of [Mother's] parental rights?

II. Did the orphans['] court commit an error of law by failing to consider the deliberate conduct of Father that prevented Mother from communicating with [] Child when establishing grounds for the involuntary termination of [Mother's] parental rights?

Mother's Brief at 4.

We will review Mother's issues together, as they are interrelated. Mother argues that the trial court abused its discretion in terminating her parental rights pursuant to section 2511(a)(1), because the trial court did not view the evidence in light of the totality of the circumstances and disregarded Mother's repeated attempts to contact Child, despite her limited resources, and the fact that Father deliberately stymied her attempts. *Id.* at 13. Mother asserts that she was unable to perform her parental rights, because Father did not permit her to do so. *Id.* Mother also contends that Father's deliberate conduct prevented her from communicating and developing a bond with Child. *Id.* at 22. Mother asserts that Petitioners admitted to creating obstacles to Mother's contact with Child, and refusing to facilitate any contact whatsoever with Mother, or allowing Mother to remain in Child's life. *Id.* at 19-20.

Specifically, Mother argues that

> the trial court was incorrect in stating that "Natural Mother never provided Father with her current residence address of a phone number where she could be reached" and she "did not even text Father to ask about [] Child's welfare." *See* Appendix A, p. 7. [Trial Court Opinion, 12/1/20, at 7]. Again, testimony established that the court's recitation of the facts was incorrect. [Mother] testified that she called and texted [] Father multiple times a week to speak with her daughter and leaving her updated

- 10 -

contact information. It was [] Father, in fact, that relocated and did not tell [Mother] where he took their daughter. [] Father put [Mother] in an unwinnable situation where she had no opportunity whatsoever to parent her own child during the six[-]month period as required by the Adoption Act.

[] Father's conduct by disallowing any contact by [Mother] with her daughter during the required six[-]month period is contrary to the purpose of the law. [Mother] simply could not parent her child because [] Father withheld [] Child from her, despite [Mother's] efforts. As the trial court misapplied the facts of record and failed to apply the applicable law as set forth herein, the trial court committed an error of law and[,] therefore, the trial court's [O]pinion must be reversed and remanded.

Mother's Brief at 20-21.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, [] 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, [], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the

relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b).[3] *See In re B.L.W.*, 843 A.2d 380, 384

---

[3] Although Mother does not specifically raise section 2511(b), we will address it nonetheless. *See In re C.L.G.,* 956 A.2d 999, 1010 (Pa. Super. 2008) (addressing section 2511(b) although parent did not challenge the trial court's analysis under that section).

(Pa. Super. 2004) (*en banc*).  We will address sections 2511(a)(1) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (1988).

- 13 -

Further, this Court has stated,

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

In *Adoption of S.P.*, our Supreme Court reiterated the standard with which a parent must comply in order to avoid a finding that he abandoned his child.

[W]e noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [*McCray*] at 655.

* * *

Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*Adoption of S.P.*, 47 A.3d at 828 (footnotes and internal quotation marks omitted).

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the

- 14 -

child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010). "Additionally, section 2511(b) does not require a formal bonding evaluation." *Id.* Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent.… Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the

> development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of ... her child is converted, upon the failure to fulfill ... her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

The trial court addressed Mother's issues regarding section 2511(a)(1) and (b), and Father's obstruction of her communication and bonding with Child as follows:

1. Natural Mother's minimal efforts of phone contact are not sufficient to stop the six-month period from running under section 2511(a)(1). Since Natural Mother otherwise refused or failed to perform her parental duties for six months, the requirements of 2511(a)(1) are met.

* * *

6. Natural Mother's explanation for her conduct is inadequate. She easily could have done more. The outcome of the custody trial should have been a wakeup call that her parenting was lacking[,] and she needed to realign her conduct to maintain a proper place of importance in [] Child's life. Instead of doing so, she exacerbated the disconnect by withholding transfer of custody and filing a Protection from Abuse [P]etition, resulting in the entry of the February 9, 2018 [O]rder requiring that all of [] Child's future contact with Natural Mother be supervised. Thereafter, Natural Mother did not have any contact with [] Child. Her post-petition conduct was also effectively non-existent. While she did have one isolated contact, she did not produce any other evidence of having made attempts to repair the relationship.

7. With respect to Section 2511(a)(1), therefore, the [c]ourt concludes that Natural Mother, by clear and convincing evidence of conduct continuing for a period of at least six months immediately preceding the filing of the [P]etition, has evidenced a settled purpose of relinquishing her parental claim to [] Child and refused and failed to perform her parental duties and obligations.

8. The [c]ourt next considered, under Section 2511(b), whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.*

9. In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In Re Z.P.*, *supra* at 1121.

- 17 -

10. The [c]ourt concludes that no substantial emotional bond still exists between Natural Mother and [] Child for the reasons enumerated in paragraph fifteen of our findings of fact.

11. The court next specifically considered whether [] Child has developed a meaningful bond with the Petitioners.

12. The inevitable consequence of Natural Mother's lack of contact and involvement in [] Child's life and [] Child's lack of having developed a significant emotional bond with Natural Mother has naturally led to [] Child now having a strong attachment and emotional bond with [Stepmother] as her maternal parent.

13. The [c]ourt, therefore, concludes that [] Child has established a significant emotional parent-child bond with both Petitioners, who have provided stability, safety, and security regularly and consistently to [] Child over an extended period of time.

14. [] Child will not suffer any irreparable harm if Natural Mother's rights are terminated.

15. Based upon all of the foregoing, the [c]ourt concludes as a matter of law that it is in the best interest of [] Child to terminate the parental rights of Natural Mother.

Trial Court Opinion, 12/1/20, at 16-20 (footnote omitted).

The trial court's determination that Petitioners satisfied the requirements of section 2511(a)(1) and (b) is supported by competent, clear and convincing evidence in the record. Indeed, the trial court considered Mother's failure to perform parental duties for the six-month period preceding the Petitioners' filing of the termination Petition, and the court considered (1) Mother's explanation for her conduct; (2) the post-abandonment contact between Mother and Child; and (3) the effect of termination of parental rights on Child pursuant to section 2511(b). Trial Court Opinion, 12/1/20, at 9, 16, 17, 18-19. The trial court considered the totality of the circumstances and

the actions which Mother asserts prevented her from performing her parental duties and developing any bond with Child and, rejected Mother's contentions as not credible and inadequate. *Id.* at 9, 17. Moreover, the record reveals that the trial court credited and relied upon Father and Stepmother's testimony. We cannot overturn the credibility determinations of the trial court. *See In re: R.J.T.*, [] 9 A.3d at 1190 (requiring an appellate court to accept the findings of credibility determinations of the trial court if they are supported by the record).

Our review discloses sufficient evidence in the record from which the trial court, considering Child's needs and welfare, could have properly found that Mother failed to perform her parental duties to Child during the six-month period preceding the filing of the Petition; Mother's explanation for her conduct was unconvincing; there was no bond between Child and Mother because of her own inaction to develop a bond with Child; and the termination of Mother's parental rights was in Child's best interest. We will not disturb the trial court's Decree. *In re Adoption of S.P.*, 47 A.3d at 826-27; *In re: T.S.M.*, 71 A.3d at 267. Accordingly, we affirm the trial court Decree terminating Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/2/2021</u>